STATE of Oklahoma ex rel. Jan Eric CARTWRIGHT, Attorney General of the State of Oklahoma; Nancy Jewell; Oklahoma Congress of Parents and Teachers, Inc.; Oklahoma Education Association, Inc.; Independent School District # 3 of Tulsa County, Oklahoma; Independent School District # 69 of Canadian County, Oklahoma; Independent School District # 52 of Oklahoma County, Oklahoma; Independent School District # 41 of Oklahoma County, Oklahoma; Independent School District # 12 of Oklahoma County, Oklahoma; Independent School District # 2 of Cleveland County, Oklahoma; Independent School District # 1 of Comanche County, Oklahoma; Enid Education Association; Tulsa Classroom Teachers Association, Inc.; Ponca City Educators Political Action Committee; Midwest City–Del City Classroom Teachers Association; Independent School District # 7 of Tulsa County, Oklahoma, and Putnam City Independent School District # 1 of Oklahoma County, Oklahoma, Petitioners,

v.

H. M. DUNBAR, County Assessor of Garfield County, Oklahoma, Respondent,

Garfield County Industrial Authority, and its Trustees, John O. Foreman, William V. Harris, J. W. Hill, Fred E. Kaupke, Joe E. King, L. L. Long, Leland H. Miller, Hugh L. Thurman, and Jack Zaloudek; and Koehring Company; and Chesterfield Cylinder Company, Inc., Respondent Intervenors.

No. 54281.

Supreme Court of Oklahoma.

Jan. 29, 1980.

Rehearing Denied April 14, 1980.

**902**

Jan Eric Cartwright, Atty. Gen., John F. Percival, Asst. Atty. Gen., Mike Bardrick, Jennie McLean, Legal Interns, Oklahoma City, for petitioner, Attorney General of Oklahoma.

Lana Jeanne Tyree, John F. Cooper, Jane E. Gallagher, M. Ann Kilpatrick, Speck, Philbin, Fleig, Trudgeon & Lutz, Oklahoma City, for petitioners except the Attorney General.

Earl E. Goerke, Dist. Atty., Albert J. Hoch, Asst. Dist. Atty., Enid, for respondent.

Denzil D. Garrison, Garrison, Brown & Carlson, Oklahoma City, Rebecca L. Adams, Sand Springs, for respondent–intervenor, Garfield County Industrial Authority, and its trustees.

Douglas McKeever, McKeever, Glasser, Conrad, Herlihy & McKeever, Enid, for respondent–intervenor, Chesterfield Cylinder Co., Inc.

Ben L. Burdick, James C. Gibbens, D. Kent Meyers, Gary A. Bryant, W. David Tidholm, Steven R. Welch, Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, for respondent–intervenor, Koehring Co. amici curiae.

Fellers, Snider, Blankenship, Bailey & Tippens by James D. Fellers, John Joseph Snider, Margaret McMorrow–Love, Oklahoma City, William R. Grimm, Barrow, Gaddis, Griffith & Grimm, Tulsa, J. Harry Johnson, Oklahoma City, Sam A. Joyner, Lawton, David H. Loeffler, Jr., Loeffler & Allen, Tulsa, Edward H. Moler, Barefoot, Moler & Claro, Shirk, Work, Robinson & Williams by James E. Work, Richard B. Bates, Oklahoma City, Wilson Wallace, R. Rhys Evans, Ardmore, Wes Watkins, Washington, D. C., John W. Young, Sapulpa, for amici curiae.

IRWIN, Vice Chief Justice.

The Garfield County Industrial Authority, a public trust, (GCIA) was created pursuant to 60 O.S.1971, §§ 176–180, as amended.[1] Garfield County is the beneficiary.

Since the Legislature first authorized the creation of public trusts as a vehicle for "public trust financing" in 1951, ad valorem taxes have not been assessed or paid upon public trust property or upon the possessory

1. 60 O.S.1976 Supp. § 176 provides:

"(a) express trusts may be created to issue obligations and to provide funds for the furtherance and accomplishment of any authorized and proper public function or purpose of the state or of any county or municipality in real or personal property, or either or both, or in any estate or interest in either or both, with the state, or any county or municipality as the beneficiary thereof ..."

or contractual interests of private entities in such property.[2] At issue in this proceeding is the ad valorem tax status of the possessory and contractual interest which two private entities have in trust properties in which GCIA holds legal title. The two private entities are Koehring Company (Koehring) and Chesterfield Cylinder Company, Inc. (Chesterfield). Koehring and Chesterfield acquired their respective possessory rights, and whatever additional interests each may have, under separate "Lease Agreements" negotiated with GCIA. GCIA is referred to in each agreement as "Lessor" and Koehring and Chesterfield are referred to as "Lessee."[3]

In this original proceeding the Attorney General, et al., seek a Writ of Mandamus directing the Respondent, H. M. Dunbar, County Assessor of Garfield County, to assess and place on the ad valorem tax rolls all the real and personal property which Koehring and Chesterfield have or hold by reason of the "Lease Agreement" each has with GCIA. GCIA, Koehring and Chesterfield were authorized to intervene and will be referred to collectively as Intervenors unless referred to separately by name.

## I

### FACTS AND ISSUES

The background giving rise to this litigation is briefly summarized. On July 31, 1979, the Attorney General of the State of Oklahoma, rendered an opinion in which he concluded that . . .

> "private lessees of public trust property, whether real or personal, have a separate, identifiable property interest which is not by reason of any retained trust or governmental beneficial ownership exempt from taxation under . . . the Constitution of the State of Oklahoma,"

and that County Assessors are required to place such leased property upon the tax rolls for the purpose of ad valorem taxation. In reaching this conclusion the Attorney General withdrew a prior official opinion of a former Attorney General in which it was concluded that under Art. X, § 6A of the Oklahoma Constitution . . .

> "intangible personal property consisting of a leasehold interest in real and personal property held in trust for the use and benefit of a county of this State is not subject to ad valorem taxation."[4]

Since the opinion of the Attorney General advanced an entirely different concept concerning the ad valorem tax status of public trust property, several proceedings were commenced in different parts of our state which placed in issue the correctness of the July 31 opinion of the Attorney General. The correctness of the opinion was challenged on constitutional grounds, i. e., public trust property is not taxable because all property, both real and personal, in which legal title is held by a public trust, is constitutionally exempt from ad valorem taxa-

2. Title 60, ch. 4, pages 166–167, 1951 Session Laws; and 60 O.S.1971, § 176 et seq., as amended. Although the statutes contained no language in reference to ad valorem taxation of public trust property until 1976 (Ch. 222, § 12, page 261, 1976 Session Laws; 60 O.S.1976 Supp. § 178.5) general ad valorem taxes have never been imposed upon public trust property.

3. The GCIA–Koehring "Lease Agreement" is dated December 1, 1977, and the GCIA–Chesterfield "Lease Agreement" is dated June 1, 1979. Although these agreements are termed "Lease Agreement", as will be hereinafter shown, both Koehring and Chesterfield have complete control and possession of the "leased" property under an executory contract to purchase.

4. Official opinion of the Attorney General (No. 69 156), dated March 17, 1969, as addressed to the Governor of Oklahoma.

Art. X, § 6A(f) of the Constitution provides: "Intangible personal property as below defined shall not be subject to ad valorem tax or to any other tax in lieu of ad valorem tax within this State

\* \* \* \* \* \*

(f) All interests in property held in trust or on deposit within or without this State, and whether or not evidenced by certificates, shares or other written evidence of a beneficial ownership."

We note the existence of two sections denominated § 6A in our Constitution. As used in this opinion, said section refers to that adopted on August 27, 1968.

tion.[5] It is evident that the ad valorem tax status of the possessory and contractual interest of private entities in public trust property is *publici juris* and of immediate concern to the people of our state. We assume original jurisdiction. *State of Oklahoma, ex rel. Poulos v. State Board of Equalization*, Okl., 552 P.2d 1134 (1975).

We should first clarify the issues. Intervenors correctly point out that the legal theory upon which the Attorney General based his July 31 opinion is not the primary basis upon which petitioners predicate their entitlement to the writ sought in this action. A fair reading of the July 31 opinion discloses that it is based upon the conclusion that the leasehold interest of a private lessee in public trust property is taxable, with each private lessee's entitlement to a tax exemption being determined by reference to the nature of the lessee's use of property. In this action, petitioners rely primarily upon the doctrine of "equitable ownership", i. e., that Koehring and Chesterfield are the "owners" of the property under their contractual agreements with GCIA. Petitioners argue the "Lease Agreements" establish a vendor–purchaser relationship with GCIA as vendor and Koehring and Chesterfield, as purchasers. They submit that Koehring and Chesterfield each have complete possession and control of their properties under executory contract to purchase, and the only purpose for retention of title by GCIA is to secure payment of the "purchase price," to wit, the rental payments to retire the outstanding bonds.

We are concerned here with only the legal issues presented on this *record,* and not with abstract questions of law concerning the correctness of the July 31 opinion of the Attorney General. Although it may appear that this action presents the correctness of that opinion, the issues as framed by the *record* are entirely different. The Attorney General was responding to the narrow legal question posed, i. e., whether a "leasehold" interest in public trust property is taxable. Tax liability is sought here on a broader basis, i. e., that Koehring and Chesterfield are the "owners" of their respective properties. As the discussion which follows indicates, the record demonstrates conclusively that we are not dealing with "leasehold" interests, but with executory contracts to purchase. If and when a justiciable controversy arises involving "leasehold" interest, the courts of this state will be open to resolve that issue.

The propriety, desirability, wisdom or practicality of industrial revenue bond financing through public trusts in Oklahoma in its relationship to the tax status of private interests in public trust property is not in issue. Our function is clearly limited to determining only legal issues. *Tate v. Logan*, Okl., 362 P.2d 670 (1961); and *Application of Oklahoma Capitol Improvement Authority*, Okl., 410 P.2d 46 (1966).

## II

### EXEMPTION UNDER ART. X, § 6

Article X, Section 6 of the Oklahoma Constitution provides that "All property *used* . . . exclusively for religious and charitable purposes, and all property *of* . . . this State, and of the counties and of the municipalities . . . shall be exempt from taxation . . ." (emphasis added).

There is a clear legal distinction between "property *used*" and "property *of.*" In *State ex rel. City of Tulsa v. Mayes County Treasurer*, 174 Okl. 286, 51 P.2d 266 (1935) we said:

"It is the general rule that where the Constitution and laws of a state exempt from taxation all property of municipalities within the state, without reference to the *use* to which the property is put, it is exempt from all taxation regardless of the character of the *use* thereof . . .

Under the plain provision of our Constitution and the statutes enacted pursu-

---

**5.** Exempt from taxation under Art. X, § 6A(f), footnote 4, and Art. X, § 6 of Okl.Const. which provides:

"All property . . . of the United States, and of this State, and of counties and of the municipalities of this State . . . shall be exempt from taxation."

ant thereto, ownership *of* property by a municipality exempts it from taxation no matter to what *use* it may be put.

The *use* to which property is put is decisive of the question of exemption from taxation of property used for . . . religious or charitable purposes." (emphasis added)

Intervenors cite *Board of County Commissioners of Oklahoma County v. Warram,* Okl., 285 P.2d 1034 (1955), to sustain their argument that the property in question is *used* for a charitable purpose. In *Warram* the trust was created for the sole purpose of providing water and fire protection and other utility services to unincorporated areas in Oklahoma County, the beneficiary of the trust. The trust furnished services and benefits to the public. Its classification for tax—exempt status was equated with that of the Tulsa Water Department which was considered in *City of Tulsa v. Mayes County Treasurer, supra.* The activities conducted by Koehring and Chesterfield are not charitable, but private business enterprises and do not come within the "property *used* . . . for charitable purposes" proviso of section 6, *supra.*

The language in *Warram* concerning the tax—exempt status of public trust property may not be construed as exempting the interests of Koehring and Chesterfield. The exemption there involved the property of a trust which furnished public services and benefits of which Oklahoma County was beneficiary. The issue here is whether the interests of Koehring and Chesterfield, two private enterprises which furnish no "public service or benefits", are exempt from taxation.

The critical issue is the meaning of the term "property *of* this State, and *of* counties and *of* municipalities." The basis for Intervenors' contention is that title in the state, county or municipality is sufficient to constitute "property *of*" within the meaning of section 6.

Intervenors cite *City of Hartshorne v. Dickinson,* 207 Okl. 305, 249 P.2d 422 (1952) as addressing the very heart of the issue presented. In that case real property was

conveyed to J. E. Layden, as trustee for the use and benefit of the City of Hartshorne. Layden had no personal interest in the property, and according to the undisputed testimony, the property was owned by the municipality. Only legal title was held by Layden. We held the property was exempt from taxation because it was owned by the municipality. The fact that legal title was held by a trustee who himself had no tax—exempt status did not render the property taxable. *City of Hartshorne* supports the principle that if real property is "owned" by a municipality, such property is exempt from taxation although bare legal title is held in the name of an entity which is not tax—exempt. Actual "ownership", not legal title, was the controlling factor in determining the exemption issue in *Hartshorne.*

Intervenors argue that *Sublett v. City of Tulsa,* Okl., 405 P.2d 185 (1965) established the rule that even the most capitalistic of enterprises utilizing public trust property does not affect its tax—exempt status. In so far as material here, *Sublett* holds that in the hands of a municipality such property retains its tax—exempt status despite its use by private enterprise under a lease agreement. No effort was made in *Sublett* to tax the interest of the lessee, and the lessee's taxable interest, if any, was not in controversy.

*State ex rel. City of Tulsa v. Mayes County Treasurer, supra,* is similarly inapplicable. In that case we held that land purchased by a municipality for water purposes was exempt from taxation although the municipality had granted private industry the right to maintain and operate private business for profit upon the municipally owned facilities. Again, the taxability of the interest of the lessee was not in controversy.

*Hoover Equipment Co. v. The board of Tax Roll Corrections of Adair County,* Okl., 436 P.2d 645 (1968) involved personal property in the possession of a county pursuant to a lease agreement. We said ". . . the exemption of . . . all property of the . . . counties . . . means that such property must be owned by the county." Although

we held that Hoover, the lessor, was the owner and the property was not tax–exempt, the case supports the proposition that legal title alone is not determinative of the tax status of property. No specific reason was used to show that the county was not the owner, but the facts disclosed that the lease was for an annual term and the county could terminate it at each anniversary date. The county was not obligated to purchase the property, and could not have constitutionally obligated future income and revenues beyond the current year. There was no showing the county was obligated to make the rental payments in case of destruction of the leased property. As will be hereinafter shown, none of the above factors are present in the instant case.

■ In examining the above authorities and cases of similar import, we find the fact that legal title to the properties in the case at bar is in GCIA is not of itself determinative of the tax exemption under the "property *of*" portion of section 6. The determinative factor is "ownership." Therefore, we must determine the quantum of interest which Koehring and Chesterfield have in the properties. If there interest is sufficient to constitute "ownership" such property is not tax–exempt within the purview of section 6, *supra*. We recognize that the question of "ownership" ordinarily should be resolved in a trial court in the first instance, but we have assumed original jurisdiction in this case, and the facts herein set forth conclusively show that Koehring and Chesterfield are the "owners" of their properties in which legal title is held by GCIA.

## III

### INTERESTS OF KOEHRING AND CHESTERFIELD

The "Lease Agreements" reveal numerous obligations and rights of the "lessees" (Koehring and Chesterfield) which are not ordinarily incidents of a leasehold estate. By means of example we list some of these rights, duties and obligations which make it apparent to us that such "Lease Agreements" are nothing more or less than executory contracts for the sale of property to Koehring and Chesterfield by GCIA, a public trust.

While identical language is not employed in both agreements, both similarly provide that: (1) the lessee is responsible for planning, supervising and insuring the construction of the improvements and development of the project; (2) in the event GCIA is unable to generate sufficient funds to complete the project, lessee is required to pay the balance for the completion without reimbursement or reduction in the amount of total indebtedness due; (3) lessee is obligated to pay all taxes and governmental charges of any kind which might be imposed; (4) lessee is required to maintain all insurance coverage, including workmen compensation insurance, during construction and term of the "lease"; (5) all risks are upon the lessee, and accidental destruction of the property or loss by eminent domain proceedings neither suspends nor reduces the full amount of the indebtedness due; and (6) lessee agrees to purchase and GCIA agrees to sell for $100 at the termination of the lease.

The entire payments to be made under the "Lease Agreements" cover all amounts necessary to acquire, construct, and protect the leased properties, and to service and retire the full bonded indebtedness. The $100 nominal consideration required to effect transfer of legal title to Koehring and Chesterfield bears no reasonable relationship to the purchase price or value of the property. Where a "lease agreement" between a public trust and a private entity contains provisions relating to the sale and purchase or an option to purchase trust property, and specifies a nominal consideration to effect either transaction, the substance of the transaction, and not the name of the parties have given it, should determine the taxable status of the property. Although there is a clear legal distinction between a contract to purchase and an option to purchase, there is no material distinction between the two in determining the taxable status of public trust property

where the consideration required to effect the transfer of title is nominal and bears no reasonable relationship to the value of the property.

The "lessees" obligations are unconditional and all risks of loss are placed upon them. The legal impact of the lease agreement is the same in this respect as if they had been termed "contracts for deed." The risks—of—loss provision tracks the provision of our "Uniform Vendor and Purchaser Risk Act", 16 O.S.1971, §§ 201–203. Under that act any contract made . . .

> " . . . for the purchase and sale of realty shall be interpreted as including an agreement that the parties shall have the following rights and duties, unless the contract expressly provides otherwise:
>
> \*   \*   \*   \*   \*   \*
>
> (b) if, when either the legal title or the possession of the subject matter of the contract has been transferred, all or any part thereof is destroyed without fault of the vendor or is taken by eminent domain, the purchaser is not thereby relieved from a duty to pay the price, nor is he entitled to recover any portion thereof that he has paid."
>
> \*   \*   \*   \*   \*   \*

■ Both "Lease Agreements" contain an agreement to purchase and to sell and specific details as to the manner in which all payments shall be made and provide for the immediate and continuing right of possession in the lessee—purchasers (Koehring and Chesterfield). Under 16 O.S.1976 Supp. § 11A,[6] these contracts of purchase would be treated as mortgages from the purchasers to GCIA. In ·In Re Inglis, 69 Okl. 64,

169 P. 1083 (1917) we said that a mortgagor in possession is considered as the owner of the land, and it is his duty to pay the taxes and assessments levied thereon. We hold that Koehring and Chesterfield each are in possession of their properties under executory contracts to purchase.

## IV

## OWNERSHIP FOR TAX PURPOSES

Petitioners cite *Bowls v. Oklahoma City*, 24 Okl. 579, 104 P. 902 (1909) in support of their contention that when a contract to purchase is entered into between a tax—exempt vendor and a taxable vendee, the vendee is the "owner" for ad valorem tax purposes. In *Bowls*, the tax—exempt vendor (Oklahoma City) entered into a contract to sell real property to Bowls. The question presented was "whether the holder of the equitable title to land (Bowls) is regarded in law as the owner thereof under Wilsons' Rev. & Ann.St.Okl.1903, § 5391,[7] and, if so, whether an assessment of a general tax against the property in his name as such owner is valid."

In affirming the trial court's judgment that determined the assessment valid and the property taxable we held:

> "A vendee of realty, in possession under an executory contract of sale at the date of the assessment, is the real owner for the purpose of taxation, and that, too, whether prior to said sale the same was subject to taxation in the hands of his vendor or not."

Intervenors contend that even if their contractual agreements could be construed

---

6. 16 O.S.1976 Supp. § 11A provides:

"All contracts for deed for purchase and sale of real property made for the purpose or with the intention of receiving the payment of money and made for the purpose of establishing an immediate and continuing right of possession of the described real property, whether such instruments be from the debtor to the creditor or from the debtor to some third person in trust for the creditor, shall to that extent be deemed and held mortgages, and shall be subject to the same rules of foreclosure and to the same regulations, restraints and forms as are prescribed in rela-

tion to mortgages. No foreclosure shall be initiated nor shall the court allow such proceedings, unless the documents have been filed of record in the county clerk's office, and mortgage tax paid thereon, in the amount required for regular mortgage transactions."

As to personal property which are "goods", 12A O.S.1971 § 2–401 achieves a similar result.

7. We find no material difference between the 1903 tax statute and the present tax statutes in reference to imposition of the tax in issue.

as lease/purchase contracts, the taxability of property under the rule announced in *Bowls*, and cases of similar import, was laid to rest by this Court in *Lederman v. Bodovitz*, 198 Okl. 276, 177 P.2d 1002 (1947). Intervenors argue this Court reconsidered *Bowls* and refused to follow it, and the rule established in *Lederman* is the law today.

*Lederman* involved the taxability of unallotted tribal land of the Choctaw and Chickasaw Nations which had been sold under regulations promulgated by the Department of the Interior. The land was sold in 1925 with 25% being paid in cash at the time of sale and the balance being paid in deferred installments. The purchaser went into possession immediately, and the final payment was made in 1937. The property had been sold for delinquent taxes for the year 1937 and prior years. The issue presented was whether ad valorem taxes could be assessed against the property prior to the time full payment was made. The Court held:

"Where unallotted lands of the Choctaw and Chickasaw nations are sold under the supervision of the Department of the Interior and the purchase price is fully paid and certificate of sale issued to the purchaser, such lands thereupon become subject to assessment for ad valorem taxation on the first day of January following, notwithstanding a deed thereto has not been issued to the purchaser pursuant to such sale, but prior thereto said lands are not taxable."

*Lederman* involved the validity of a resale tax deed, and it was contended the tribal land was taxable prior to full payment of the purchase price. *Bowls* was cited as authority. In discussing *Bowls*, the *Lederman* Court said:

"Bowls ... in a measure supports defendant's contention. But it appears to be based upon an erroneous holding that Bowls, who purchased from the city but had not fully paid the deferred installments, was 'likened to one who holds a final certificate for lands purchased from the United States of which said lands it has been held that the purchaser holds the equitable title, and while, of course, not taxable in the hands of the United States, are taxable in his hands.'

Examination of the cases bearing on that question will disclose that in purchases of land from the United States, a final certificate does not issue until the purchaser has paid the purchase price in full. It is from that time, and that time only, after the purchaser has done everything necessary to entitle him to a patent, and until a patent is issued, that the purchaser holds the equitable title and the United States holds the legal title in trust for the purchaser."

The tax question presented in *Bowls* was entirely different from that in *Lederman*. *Bowls* involved a contract to purchase property from a municipality, and the taxability of such property is controlled by state law. *Lederman* involved tribal land purchased under regulations promulgated by the United States Department of Interior, and whether a state may tax property held under contract of purchase from the United States is determined by federal law. *S. R. A. Inc., v. State of Minnesota*, 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851 (1946).

The syllabus in *Lederman* is confined to the taxability of federal land held under contract of purchase and makes no reference to state land. In *Eckles v. Traverse*, Okl., 362 P.2d 683 (1961) we held "[s]yllabus of a decision of the Supreme Court of Oklahoma states the law of Oklahoma, but the pronouncement must be interpreted with reference to the facts upon which it is predicated and the questions presented to and considered by the Court." We find no language in *Lederman* suggesting modification of *Bowls* in reference to the taxability of state land held under a purchase contract, but we agree with petitioners that *Lederman* is a misinterpretation of a state's right to tax land purchased from a federal agency.

It is evident the court in *Lederman* followed *State v. Itasca Lumber Co.*, 100 Minn. 355, 111 N.W. 276 (1907) which involved the presentation of script, with an application to locate upon certain federal lands which

gave the applicant a preference over other subsequent claimants, but until the application was approved and acted upon by the Commissioner, the applicant acquired no interest in the land, either legal or equitable, or against the United States. The syllabus in *Itasca* stated:

"Where legal title to land remains in the United States the land is subject to taxation by the state only after the full consideration has been paid and a perfect equitable title has vested in purchaser."

As will be hereinafter shown, the syllabus in *Lederman* was entirely too broad, and prior to the time *Lederman* was promulgated in 1947, the United States Supreme Court in *S. R. A., Inc., v. State of Minnesota, supra,* decided in 1947, had already held that under ordinary contracts to purchase federal land, with partial payment made and the purchaser placed in possession, such land is taxable by a state. The question presented to the Supreme Court of the United States was on certiorari to the Supreme Court of Minnesota in *Petition of S.R.A., Inc.,* 219 Minn. 493, 18 N.W.2d 442 (1945), and involved the power of the State of Minnesota to tax real property in which legal title was in the United States. The taxed property had owned by the United States and had been purchased on public sale and improved by S.R.A. who was in full possession under an executory contract of sale between it and the United States at the time of the levy of the state tax. The Supreme Court of Minnesota in *Petition of S.R.A., Inc., supra,* had upheld the right of the state to tax the property even though legal title remained in the United States. The United States Supreme Court granted certiorari "because of the importance and uncertainty of the question of the right of a state to tax realty sold by the United States in possession of a buyer from the government under a contract of sale with uncompleted conditions for execution and delivery of the muniments of title." The uncertainty of the question mentioned above had reference to the varying results that had been reached by other courts in similar situations. Two of the situations discussed with varying results were (1) in normal executory contracts for sale with partial payment and the purchaser in possession; and (2) where entry had been made upon federal lands under the Reclamation and Homestead Acts.

The Supreme Court of the United States in *S.R.A., supra,* held that an executory contract for sale of lands by the United States to a private purchaser, under which the purchaser is given possession and is to receive the legal title upon payment of the purchase price, operates to subject the lands to the tax laws of the state. The Court said there were no characteristics in the contract "which differentiate it from the normal executory contract for the sale of land with partial payments;" and that such contracts transfer "to the purchaser the equity in the land; . . . that equity is realty; it is owned by the vendee; and the United States retains only a legal title or security and in substance is in the position of a mortgagee."

In discussing the situation involving the taxability by a state of property occupied by an entryman under the Reclamation and Homestead Acts who had not received his required final certificate of land clearance,[8] the rule under which the *Itasca* case would fall, the Court said:

"The reason for the rule against state taxation until the equitable title passes from the United States to the entryman was there placed upon the policy of the Government to require those who sought governmental land to perform the required conditions of residence or improvement before beneficial title, subject to state taxation, passes from the United States to the locator. This transfer was said not to take place until the certificate was issued . . . The prohibition of state taxation until the certificate was issued was one of the means by which the Government furthered its public policy of land settlement. After compliance with the condition and before patent, the state could tax."

---

8. See *Irwin v. Wright,* 258 U.S. 219, 42 S.Ct. 293, 66 L.Ed. 573, (1922).

When *Lederman* was decided the United States Supreme Court had clearly established that an executory contract to sell lands by the United States to a private purchaser, under which the purchaser is given possession and is to receive the legal title upon payment of the purchase price, operates to subject the land to the tax laws of the state.

Although *Lederman* did not attempt to change the rule announced in *Bowls* in reference to sale by a municipality or state agency, the language in reference to the taxability of land which is held under contract of purchase with the federal government is far too broad. Therefore, *Lederman* is deemed to be modified to the extent necessary to make it consistent with the views herein expressed.

■ We conclude that the rule in *Bowls* is controlling in the case at bar. Koehring and Chesterfield are in possession of their properties under executory contracts for sale, and they are the "owners", even though legal title to the properties is in the vendor, GCIA, a public trust. The interest of Koehring and Chesterfield in the trust properties are not exempt from taxation under Art. X, § 6, *supra*.

## V

### EXEMPTION UNDER ART. X, § 6A

Intervenors contend the property is exempt because of the provisions of Article X, § 6A of the Oklahoma Constitution, which provides in part:

"Intangible personal property as below defined shall not be subject to ad valorem tax or to any other tax in lieu of ad valorem tax within this state:

\*    \*    \*    \*    \*    \*

(c) Accounts and bills receivable, including brokerage accounts, and other credits, whether secured or unsecured.

\*    \*    \*    \*    \*    \*

(f) All interests in property held in trust or on deposit within or without this State,

and whether or not evidenced by certificates, shares, or other written evidence of beneficial ownership."

This section, adopted in 1968, abolished the intangible tax which had been imposed by 68 O.S., 1965 Supp. § 2501. It is argued that interests previously taxed under that section are now exempt from taxation. Relying on *Jones v. Livingston*, 205 Okl. 332, 237 P.2d 867 (1951), intervenors assert that a "leasehold" was taxable under the intangible property tax, and is now exempt by reason of § 6A. We are not concerned here with a pure leasehold interest but with an executory contract to purchase.

■ It is also argued that the property is exempt under § 6A, *supra*, by reason of subsection (f). This argument tracks the reasoning of Attorney General Opinion No. 69–156, *supra*, which concluded that the interests of lessees of public trust properties were exempt as "interests in property held in trust." The logical extension of that argument is that any interest in land which happens to be part of a trust would be exempt. That is not the intent of the subsection as an examination of its entire provisions reveals. It provides the interest is exempt, "whether or not evidenced by certificates, shares, or other written evidence of beneficial ownership." The intent of this section was to prohibit taxation of the beneficial interest which may be held in a trust *res*. Under such an analysis, the interests of Koehring and Chesterfield who are holding under executory contracts of purchase, do not qualify for exemption under this section.

## VI

### IMPAIRMENT OF CONTRACT AND ESTOPPEL

It is contended that the imposition of any tax upon public trust property would be an impairment of contractual obligations which is prohibited by Article 2, section 15, Oklahoma Constitution and Article 1, section 10, United States Constitution.[9]

The primary principle upon which it is contended that public trust property is not

**9.** We notice that Koehring and Chesterfield both agreed in their separate "lease agreements" to pay all taxes and governmental charges that may be lawfully assessed or levied.

taxable is that it is constitutionally exempt from taxation because a tax–exempt entity (county) "owns" such property. The failure of the taxing authorities to place public trust property on the tax rolls has not been due to some legislative enactment specifying that such property was not taxable, neither do petitioners attempt to tax such property because of a legislative change. The property has not been placed upon the tax rolls because the taxing authorities were following the opinion of the former Attorney General (No. 69–156) which concluded the property was tax–exempt.

Therefore, no legislative enactment has impaired a contractual obligation.

In reference to the impairment question by reason of a judicial decision, the court in *Peevyhouse v. Garland Coal & Mining Co.,* 382 P.2d 109 (1963) in its supplemental opinion on rehearing said:

"It may be conceded that at one time there was respectable authority for the proposition that the 'contract' clause was violated by a judicial decision which overruled prior decisions, upon the strength of which, it should be noted that our decision overrules no prior holdings of this court upon which the contracting parties could be said to have relied. Even if it did,

'. . . it is now definitely and authoritatively settled that such prohibition in federal and state constitutions relates to legislative actions and not to judicial decisions. Thus, they do not apply to the decisions of a state court, where such decision does not expressly, or by necessary implication, give effect to a subsequent law of the state whereby the obligation of the contract is impaired . . .' 16 C.J.S. Constitutional Law § 280.

To the same effect, see 12 Am.Jur. Constitutional Law, Sec. 398."

Prior to this proceeding this Court had never been called upon to determine whether or not public trust property held by a purchaser in possession under an executory contract to purchase is taxable. In holding that such property is taxable, we have not overruled any previous decisions nor is our decision in conflict with any decision involving property purchased from the state or a state agency. Therefore, even if the "contract" clause is violated by a judicial decision which overrules a prior decision, the "contract" clause has not been violated in the case at bar.

■ We hold that the imposition of a tax upon the property in question would not violate the constitutional prohibition against impairment of contractual obligations.

■ It is contended the state is estopped from assessing these properties because of the reliance of "lessees of public trust properties" on the generally held view that such interests were exempt from taxation. Beyond the fact that the two lease agreements in issue specifically contemplate a change in the tax law, interpretation, and administration, which seems to belie any contention of reliance, it is fundamental that a state and its subdivision cannot be estopped from protecting public rights when public officials have acted erroneously or failed to act. *Layne–Western Co. v. City of Depew,* 177 Okl. 338, 59 P.2d 269 (1936). Koehring and Chesterfield may not rely upon estoppel to defeat the imposition of taxes upon their taxable interests.

It is suggested that if this Court should find that the interests of "lessees" in public trust property is taxable, that the Court limit the effect of such decision by making it apply prospectively, i. e., to "lease agreements" entered into after the effective date of this opinion. Having rejected the argument that the state is estopped from taxing this property, and that the taxing of such property would unconstitutionally impair the obligations of contracts, we may not achieve the same result by judicial decree.

## VII

### CONSTITUTIONALITY OF 60 O.S.1977 SUPP., § 178.7, RELATING TO "IN LIEU PAYMENTS"

Petitioners contend that 60 O.S.1977 Supp., § 178.7, is unconstitutional in that it

permits a tax exemption for a period of years of all interests in public trust property. That section requires a lessee of public trust property to pay an annual sum in lieu of ad valorem taxes for each year following the tenth anniversary date of the issuance of the revenue bonds. The term "lessee" as used in the enactment specifically includes any "individual ... corporation or other entity engaged in any trade or business for profit ... and shall include any purchaser or obligor under an installment sale agreement or other underlying financial agreement."

Article 5, section 50, Oklahoma Constitution prohibits the Legislature from exempting any property from taxation except as provided in the Constitution. If the property involved here had not been "leased" from a public trust, it would have been taxed as all other property similarly situated under our general statutory scheme of taxation, including property sold under a Certificate of Purchase by the Commissioner of the Land Office.[10] We have determined that property of a public trust held under an executory contract of purchase was not constitutionally tax–exempt. Therefore, since all other property similarly situated is statutorily taxable, any legislative attempt to delay its taxable status would be in conflict with Art. 5, § 50, *supra*. We therefore hold that all the provisions of § 178.7, as the same may be applied to interests of private entities in public trust property which we have held here are taxable is unconstitutional as applied after December 31, 1979.[11] The constitutionality of the enactment as the same may be applied to interests in public trust property other than that in controversy here, is neither considered nor determined by this decision.

## VIII

### "OMITTED PROPERTY"

Petitioners contend the taxable interests acquired by Koehring and Chesterfield in their "Lease Agreements" with GCIA should be assessed and taxed as "omitted property", for the years 1979 and 1980.[12] They also contend that on January 1, 1978, Koehring held both legal and equitable title to certain property which was included in its "Lease Agreement" with GCIA that should be considered "omitted property" for 1978, and Koehring is liable for the 1978 taxes.

In reference to the contention that Koehring is liable for 1978 taxes by reason of its legal and equitable ownership of certain properties, we hold the proper forum for litigating such controversy is in the District Court and not the Supreme Court in an original proceeding.

The next question is whether the interests of Koehring and Chesterfield should be assessed and taxed as omitted property for 1979 and 1980. This Court indirectly considered a similar issue in *State ex rel. Nesbitt v. Ford*, Okl., 434 P.2d 934 (1967) and in *Pan American Petroleum Corporation v. Board of Tax–Roll Correction of Tulsa County*, Okl., 510 P.2d 680 (1973).

In *Ford* we declared unconstitutional statutes which exempted certain lands from municipal taxation. In 1957, 1963, and 1964, the Attorney General had expressed

---

10. Public lands sold by the Commissioners of the Land Office are taxable when the Certificate of Sale is issued although all the purchase price has not been paid. 64 O.S.1971, § 185.

11. See text, infra, part VIII.

12. 68 O.S.1971, § 2439 provides:
    "§ 2439. Assessment of omitted property--Adding tax of preceding years, when collection prevented–(a) If any real, personal or public service corporation property be omitted in the assessment of any prior year or years, and the property thereby escapes just

and proper taxation, at any time and as soon as such omission is discovered, the County Assessor or the County Board of Equalization, or the State Board of Equalization in the case of public service corporation property, whose duty it is to assess the class of property which has been omitted, shall at any time cause such property to be entered on the assessment rolls and tax rolls for the year or years omitted, not to exceed the last fifteen (15) years as to real property and the last three years as to personal property, ...."

doubt concerning the constitutionality of the exemption statutes, but the taxing officials had always treated them as constitutional. In June, 1966, the Attorney General issued an official opinion in which he concluded the exemptions were unconstitutional and brought an original proceeding in our Court to mandamus certain County Assessors to place the statutorily exempted property on the tax rolls. Taxing officials in some of the counties followed the 1966 opinion of the Attorney General and placed the property on the tax rolls while taxing officials in other counties did not follow the opinion and property in their counties was not placed on the taxed rolls. Although this Court did not discuss "omitted property", we said that the equities in the case did not authorize retroactive application of our decision. Therein we quoted *State ex rel. Dawson v. Dinwiddie*, 186 Okl. 63, 95 P.2d 867 (1939).

"A writ of mandamus may properly, in court's discretion, be denied when its issuance would create confusion, especially in connection with the fiscal affairs of a governmental subdivision of the State."

In *Ford*, the opinion of the Attorney General was issued and the action was brought in our Court in 1966. In September, 1967, our decision was promulgated and we said, "such properties should be classified for city taxes beginning with the tax year 1968."

The Tulsa County Assessor had followed the 1966 opinion of the Attorney General and placed the property on the tax rolls. Pan American filed an action in the Tulsa County District Court to obtain a review of a denial by the Tulsa County Board of Tax Corrections for a refund of taxes paid under protest for 1966 and 1967. The District Court denied the protest and Pan American appealed. In 510 P.2d 683, *supra*, we held our decision in *Ford* became operatively effective "beginning with the tax year 1968." Therein we said:

"It is basic under our Constitutions, both State and Federal, that all men are entitled to the equal protection of the law. Art. 10, § 5, of our Constitution provides that 'Taxes shall be uniform

upon the same class of subjects.' Art. 5, § 59, of our Constitution prescribes that 'Laws of a general nature shall have a uniform operation throughout the State, * * *.'"

The basic reason for making Ford operatively effective "beginning with the tax year 1968" was that some County Assessors had followed the 1966 opinion of the Attorney General and placed property on the tax rolls and other County Assessors had not followed the opinion. Our decision made the imposition of the municipal tax uniform throughout the state beginning in 1968 upon the same class of property.

Although our statutes contained no language in reference to ad valorem taxation of public trust property, no taxes have been assessed or paid thereon or upon the possessory or contractual interests of private entities in such property since the Legislature first authorized public trust financing in 1951.

It appears the Legislature was of the view that public trust property was constitutionally exempt from taxation. See 60 O.S.1976 Supp., § 178.5. The March 17, 1969, opinion of the Attorney General (No. 69–156) concluded that property in which legal title was in a public trust was not taxable. In *Pan American, supra*, we said it is the duty of public officers, such as County Assessors, with notice thereof, to follow the opinion of the Attorney General until relieved of such duty by a court of competent jurisdiction or until this Court should hold otherwise. The first notice to County Assessors that public trust property would be subject to taxation was the July 31, 1979 opinion of the Attorney General. If we were to declare that the property of Koehring and Chesterfield constituted "omitted property", it would mean that all interests in public trust property that will be taxable under the views expressed in this opinion would constitute "omitted property" under 68 O.S.1971, § 2439. If we correctly construe that section, the omitted property "would be entered on the assessment rolls for the year or years omitted, not to exceed the last fifteen (15) years as to

real property and the last three years as to personal property."

▮ In our opinion the "equities in this case do not authorize retroactive application of our decision herein" (see *Ford, supra*) to any year preceding the 1980 tax year. Prior to the July 31, 1979, opinion of the Attorney General expressing the conclusion that such property was taxable, the taxing authorities had been following a former opinion of an Attorney General who had concluded the property was tax–exempt. Therefore, the interests of private entities in public trust property which are taxable under this decision shall be taxable beginning with the 1980 tax year, but no interests in any public trust property shall be considered or treated as "omitted property" for any preceding year.

The interests which Koehring and Chesterfield have under their "Lease Agreements" with GCIA shall be taxed beginning with the 1980 tax year. Our holding herein shall not preclude the imposition of taxes, if any, upon the legal and equitable interests which Koehring allegedly had on January 1, 1978.

## IX

## CONCLUSION

As we have previously said, we are not passing upon the correctness of the July 31, 1979, opinion of the Attorney General and nothing contained herein should be construed as meaning that this Court approves or disapproves the reasons or conclusions of that opinion. Also, this opinion may not be construed as suggesting County Assessors and other officials should not follow that opinion in performing their official duties.

The record before us does not indicate that Respondent Dunbar will fail to perform his statutory duties in light of the principles which we enunciate in this opinion. Since we are confident that he will discharge his duties in accordance with the views expressed here, the writ of mandamus is not essential, and will not be awarded. *State ex rel. Nesbitt v. Ford, supra; St. Louis & S. F. R. Co. v. Messenger,* 26 Okl. 590, 110 P. 893 (1910).

LAVENDER, C. J., and WILLIAMS, HODGES, BARNES, SIMMS, HARGRAVE and OPALA, JJ., concur.

DOOLIN, J., concurs specially.

DOOLIN, Justice, concurring specially:

I find no fault with the majority's opinion as to taxability of the instant properties. I concur in that judgment. For myself, I would, under the doctrine of publici juris, go one step further. I would hold the Oklahoma Constitution does not authorize an exemption from ad valorem taxation to the intervenors as has heretofore been granted to them by the Garfield County Assessor or others in like position throughout the State of Oklahoma.

The adoption of § 6A [1] and the enactment of § 176 et seq. did not repeal or affect the validity of Art. V § 50 [2] for there can be no doubt the basic premise and directive of our constitution is that no exemption *except as otherwise provided by the constitution* is allowable. Art. X § 6 is an authorized constitutional provision exempting property of the United States, the state, county and municipality and charitable use property from taxation.

I am not deaf to the strong arguments and excellent briefs of the respondent and intervenors, nor am I blind to the application of trust financing in existence throughout the state. Suffice to say I am impressed and persuaded Oklahoma's Constitution and its legislative enactments create no exemptions to entities not enumerated therein.

1. We note that the Official Session Laws of 1968 as well as the annotated Constitution of Oklahoma contain two, § 6As one adopted September 17, 1968, and the other August 27, 1968. Our reference in this opinion is to § 6A adopted by the people on August 27, 1968.

2. Art. V § 50: "EXEMPTION OF PROPERTY FROM TAXATION"

    The Legislature shall pass no law exempting any property within this State from taxation, except as otherwise provided in this Constitution.

It is manifestly true that granting exemption from taxation results in increasing the burden upon less favored taxpayers; a state cannot and should not govern in this manner.

The Attorney General is correct in his conclusion contained in opinion, No. 79–168, dated July 31, 1979.[3] The lessees occupancy and pursuit of profit, or for that matter other valid rights exercised during occupancy of a leasehold estate are interests in realty and taxable. Although admittedly not factually identical and not absolutely similar in statutory or constitutional directives, I find the rationale of the following cases and jurisdictions pursuasive in holding the leasehold estates of such entities as the intervenors and others similarly situated to be taxable. See *Delta Airlines, Inc. v. Coleman*, 219 Ga. 12, 131 S.E.2d 768 (1963); *Iron Co. v. State Tax Commission*, 437 S.W.2d 665 (Mo.1969); *Purcell v. City of Lexington*, 216 S.W. 599 (Ky.App.1919); *Cutter Flying Service, Inc. v. Property Tax Department*, 572 P.2d 943 (N.Mex.App.1972) and *San Pedro L.A. & S. L. R. Co. v. The City of L. A.*, 179 P. 393 (Cal.1919).[4]

I would hold intervenors' leasehold estates taxable without reliance on provisions attempting to qualify the ownership.

---

3. All petitioners, including the Attorney General and numerous school districts within Oklahoma have presented this court with a challenge to the correctness, application and interpretation of the Constitution of Oklahoma (Art. X §§ 6, 6A) and the statutory enactments (60 O.S.1971 § 176 et seq.).

Likewise have the respondent and intervenors raised such a question under Attorney General's opinion No. 79 168. We can and should answer their challenges.

4. For an annotation reference tax exemption to property held on lease from exempt owner, see *Mitchell Aero, Inc. v. City of Milwaukee*, 42 Wis.2d 656, 168 N.w.2d 183, 54 A.L.R.3d 391, 402 (1969).