GENERAL MOTORS CORPORATION,
Appellant,

v.

OKLAHOMA COUNTY BOARD OF
EQUALIZATION, George Keyes, County Assessor of Oklahoma County, and
Joe B. Barnes, County Treasurer of
Oklahoma County, Appellees,

and

Jan Eric Cartwright, Attorney General
of Oklahoma,
Defendant-Intervenor/Appellee.

No. 58438.

Supreme Court of Oklahoma.

May 17, 1983.

As Corrected June 2, 1983.

As Amended on Grant of Rehearing
July 26, 1983.

Opinion Supplemented and Rehearing on
Amended Opinion Denied Oct. 4, 1983.

James D. Fellers, John Joseph Snider, Margaret McMorrow-Love, Fellers, Snider, Blankenship, Bailey & Tippens, Robert Macy, Dist. Atty., Kevin Leitch, Asst. Dist. Atty., Oklahoma City, Otis M. Smith, John P. Raleigh, General Motors Corp., Detroit, Mich., for appellant.

Jan Eric Cartwright, Atty. Gen., James B. Franks and Michael Scott Fern, Asst. Attys. Gen., Oklahoma City, for appellees.

IRWIN, Justice:

The Oklahoma Industries Authority (OIA), a public trust, created pursuant to 60 O.S.1961, § 176 et seq., as amended, sponsored the "public trust" financing for the construction of General Motors Corporation's (GMC) assembly plant in Oklahoma City. The issue presented is whether GMC's interest (improvements, machinery and equipment) in the plant is subject to ad valorem taxation. GMC contends its interest is not taxable because of a tax abatement agreement between it and the State of Oklahoma. GMC asserts that public agencies and officials of the State of Oklahoma agreed that if GMC would build its assembly plant in Oklahoma that such plant would not be subject to ad valorem taxation for twenty years.

The trial court in rendering summary judgment against GMC found that Art. 10, § 5, of the Okl. Const. prohibits a contract which surrenders, suspends or contracts away the power of taxation, and although the existence of a contract is disputed, such contract, even if it could be established, would be void and contrary to law; and that the assembly plant is in possession of GMC under an executory contract of purchase and is taxable under *State ex rel. Cartwright v. Dunbar*, Okl., 618 P.2d 900 (1980).

Since the Legislature first authorized the creation of public trusts as a vehicle for "public trust" financing in 1951, numerous facilities throughout the state have been constructed by private entities using such financing. *Dunbar* explains the method generally employed in Oklahoma and such method was used in financing part of the construction of GMC's assembly plant. Here, a lease contract and bond indenture were entered into between the public trust (OIA) and GMC. OIA issued bonds to help pay for part of the construction costs of

the facility. GMC paid all additional construction costs. OIA holds legal title to the property. GMC's lease payments to OIA are sufficient to amortize the bond issue and other costs. GMC will "purchase" the entire project for $1,000 when the bonded indebtedness is satisfied.

In *Dunbar* we held that the trust properties in which private entities hold a possessory and contractual interest by virtue of a lease agreement with a public trust as holder of legal title was subject to ad valorem taxation. *Dunbar* was bottomed on the theory that the Dunbar lease agreement was nothing more or less than an executory contract of sale and that property of a public trust held under a sale-purchase executory contract is not constitutionally tax exempt. GMC concedes that its assembly plant would be taxable under *Dunbar but for the tax abatement agreement.*

GMC says that the characterization of its agreement with OIA as a "lease" or "executory contract" is not of consequence as GMC understands its tax abatement agreement with Oklahoma. GMC states the substance of the agreement and this lawsuit is that Oklahoma agreed to a tax abatement for the assembly plant in return for GMC constructing the plant in Oklahoma. GMC says that it has fulfilled its part of the agreement.

GMC contends that the agreement was lawful when made and any state action which impairs the obligation of that agreement violates Art. 1, § 10, of the United States Constitution. GMC argues the Legislature in the Public Trust Act classified industrial property for tax purposes pursuant to Art. 10, § 22, of the Okl. Const., to improve economic activity and to create jobs in Oklahoma; that OIA, a state agency which was created pursuant to the Act, bargained with GMC for the tax abatement; and the negotiations and contracts of OIA constitute the negotiations and contracts of the State of Oklahoma. GMC also submits that the Attorney General's opinion (69–156) rendered in 1969, in which he expressed the view that public trust properties were not subject to ad valorem taxa-

tion was incorporated into and became a part of the tax abatement agreement between OIA and the State.

Closely related to GMC's argument that the imposition of the ad valorem taxes impairs the obligations of its tax abatement agreement is its assertion that it has been denied due process. GMC argues that the Fifth Amendment through the Fourteenth Amendment of the Federal Constitution forbids the taking of property without just compensation and that its tax abatement agreement is a property right. GMC says that both contract and property rights arising from its tax abatement agreement are protected by the Due Process Clause as well as by the Impairment of Contract Clause.

In *Dunbar* we considered the constitutionality of 60 O.S.1981, § 178.7 enacted in 1977. That enactment authorized a tax exemption for a period of years of all interests in public trust property, but the lessee (GMC-here) of public trust property was required to pay an annual sum in lieu of ad valorem taxes for each year following the tenth anniversary date of the issuance of the revenue bonds.

In *Dunbar* we said that Art. 5, § 50, Okl. Const., prohibits the Legislature from exempting any property from taxation except as provided in the Constitution. We held that since other property similarly situated was statutorily taxable, any legislative attempt to delay the taxable status of a lessee's interest in public trust property would be in conflict with Art. 5, § 50, supra, and unconstitutional.

█ Art. 10, § 22, of the Constitution authorizes the Legislature to classify property for purposes of taxation; and the valuation of different classes by different means or methods. The Legislature has a wide range of discretion in classifying subjects of taxation, and to justify judicial interference, the classification must be based on an unreasonable or arbitrary classification. *Continental Oil Company v. Oklahoma State Board etc.*, Okl., 570 P.2d 315 (1977).

■ Although the property belonging to a public trust is exempt from taxation—Art. 10, § 6, Okl. Const.—the interest a lessee (GMC-here) has in public trust property is subject to ad valorem taxation. *Dunbar, supra.*

■ If the property here had not been "leased" from a public trust, it would have been taxed as all other property similar situated under our general statutory scheme of taxation. Any attempt, legislative or otherwise, to exempt property from taxation in the possession of a "lessee" under an executory contract of purchase where the record title to the property is in a public trust, and not exempt similar property where record title to the property is in a private entity instead of a public trust, would contravene Art. 10, § 22, supra.

In *Dunbar* we also held that the State was not estopped from assessing the "lessee's" property because of its reliance on the generally held view that such interest was exempt from taxation. Our holding was based on the principle that a state and its subdivision cannot be estopped from protecting public rights when public officials have acted erroneously or failed to act.

We will now consider the enforceability of the alleged tax abatement agreement. GMC did not introduce the agreement into the record but relied upon certain opinions of the Attorney General, statements of officials of the State of Oklahoma and of various civic organizations, correspondence and news releases, and representations made by officials of OIA. In its journal entry of judgment the trial court in referring to the agreement said "although its existence is in dispute, such contract, even if it could be established, would be void and contrary to law."

The lease agreement between GMC and OIA did not spell out the tax abatement agreement but it did mention ad valorem taxes. One sentence stated that the parties recognized that as OIA is an agency of the state, the assembly plant was not subject to ad valorem taxation under the Constitution and laws of Oklahoma. However, the parties did agree that in the event the State of Oklahoma or any of its subdivisions shall demand the payment of any general or ad valorem tax that GMC would pay the tax.

We will assume, arguendo, that OIA, a state agency, entered into the tax abatement agreement with GMC; and that both parties relied upon the then current Attorney General's opinion which expressed the view that public trust properties were not subject to taxation.

■ Under general legal principles, public agents have no power to bind the state or any of its subdivisions by apparent authority in excess of their actual authority. "An unconstitutional act is not a law; it binds no one, and protects no one." *Little Rock, etc., Railway v. Worthen;* and *Huntington v. Worthen,* 120 U.S. 97, 7 S.Ct. 469, 30 L.Ed. 588. If the Legislature has not acted within the framework of the Constitution, it has not acted. An unconstitutional statute confers no rights, creates no liability, and affords no protection. *Norton v. Shelby County,* 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178. In *Zane v. Hamilton County,* 189 U.S. 370, 23 S.Ct. 538, 47 L.Ed. 858, county bonds were issued pursuant to a statute which was later declared to be unconstitutional. The United States Supreme Court held that the bonds having been illegally issued, do not constitute a contract which is protected by the Federal Constitution. 16A Am.Jur.2d, *Constitutional Law,* § 688, states:

"The Federal Constitution does not protect contracts which are invalid, illegal ... That which is not an enforceable contract right is not an obligation which can be impaired within the meaning of the constitutional prohibition.

The impairment of a contract cannot occur where the alleged contract is based on a proviso contained in a void statute. A contract which rests on an unconstitutional statute is itself void and creates no obligation to be impaired by subsequent legislation."

GMC argues that the rule in *Norton* has long been abandoned by both the federal and state courts and this abandonment is discussed in *Lemon v. Kurtzman,* 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973). In *Lemon,* non-public sectarian schools had performed services under a statute which was subsequently declared unconstitutional. The issue was whether the schools were entitled to be reimbursed for services performed prior to the court's holding that the statute was unconstitutional. The Supreme Court held the schools were entitled to be reimbursed for such services.

The *Lemon* decision is bottomed upon the theory of reliance, i.e., the schools had performed the services under a statute that had not been declared unconstitutional and for nearly two years the State and the schools proceeded to act on the assumption that the schools would continue to perform the services and that payment for such services would be made. The Court noted that the significance of the school's reliance was reinforced by the fact that State withdrew its motion for a preliminary injunction to block certain payments and did not seek injunctive relief for the suspension of payments.

The Supreme Court in *Lemon,* discussing the broad discretionary powers of the trial court in shaping equity decrees, said:

"The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."

This court in effect followed the reasoning set forth in *Lemon* when it first considered the taxability of public trust property held under an executory contract to purchase in *Dunbar.* Our decision in *Dunbar* was promulgated in January, 1980, and was prospective in reference to taxability.

In discussing the retroactive application of that decision, we said:

"In our opinion the 'equities in this case do not authorize retroactive application of our decision herein' (see *Ford* [*State ex rel. Nesbitt v. Ford,* Okl., 434 P.2d 934], *supra*) to any year preceding the 1980 tax year. Prior to the July 31, 1979, opinion of the Attorney General expressing the conclusion that such property was taxable, the taxing authorities had been following a former opinion of an Attorney General who had concluded the property was tax-exempt. Therefore, the interests of private entities in public trust property which are taxable under this decision shall be taxable beginning with the 1980 tax year, but no interests in any public trust property shall be considered or treated as 'omitted property' for any preceding year."

We are concerned here with an alleged tax exemption that the Legislature could not constitutionally grant. Surely if the Legislature is without constitutional authority to grant a tax exemption, state agencies or officials of the state could not grant such exemption. GMC was charged with notice of our Constitution and the limitations of public officials, and it may not rely on assumed authority whether such authority is assumed by the Legislature or other public officials. GMC was charged with notice of the authority of the Attorney General whose opinions may not supplant the courts. The Attorney General gives his opinion for public officials' guidance until the questions concerning them are decided by the courts. *Grand River Dam Authority v. State,* Okl., 645 P.2d 1011 (1982). GMC may not invoke in this proceeding the "reliance interest" discussed in *Lemon.*

The cases relied upon by GMC involve constitutional legislative enactments or valid contracts and it relies on the principle that "the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it," *United States ex rel. Von Hoffman v. The City of Quincy,* 71

U.S. 535, 18 L.Ed. 403 (1867), quoting in *Home Building and Loan Association v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481 (1934). This general statement of law cannot be disputed but it does not support GMC's position, because the purported tax abatement contract was not in accord with Oklahoma law at the time it was made.

■ Our decision in *Dunbar* is controlling in the case at bar and GMC's property is subject to ad valorem taxation unless the disputed tax abatement agreement is legally enforceable. The Federal Constitution does not protect unenforceable contract rights. The disputed agreement, even if it could be established, is void because no public official or public agency could constitutionally grant the tax exemption allegedly contained in the agreement. Since the alleged agreement is unenforceable, GMC is not entitled to the tax relief it sought.

In view of our decision here, we find it unnecessary to consider the force and effect of Art. 10, § 5 of our Constitution which prohibits the surrender of the power of taxation and requires taxes to be uniform upon the same class of subjects and the Fourteenth Amendment to the U.S. Constitution.

JUDGMENT AFFIRMED.

All the Justices concur.

### SUPPLEMENTAL OPINION ON REHEARING

PER CURIAM:

We hereby supplement the opinion .of this Court of May 17, 1983 (54 O.B.J. 1351) as amended by Order of July 26, 1983 (54 O.B.J. 2068) by adding thereto the following:

A further review of *Lemon v. Kurtzman*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) impels the conclusion that the rule of *Norton v. Shelby County*, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178 (1886) (that an unconstitutional statute "confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed") was not abandoned in *Lemon*. *Lemon* merely recognized an exception to the rule of *Norton* to be applied by a court of equity under certain prescribed conditions. As we shall briefly demonstrate, the parameters of the *Lemon* exception have many times been recognized and applied by this Court; and we shall further demonstrate that those parameters are not present in the case at bar.

After striking down of Pennsylvania's statutory program to reimburse non-public sectarian schools for secular educational services in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (*Lemon I*), the Supreme Court remanded to the district court which enjoined payments for services rendered after *Lemon I*, but permitted reimbursement for services prior to *Lemon I*. Appellants challenged the scope of this decree (a case in *equity*).

The circumstances peculiar to *Lemon II* were:

1. After the statute became effective, the schools entered into the contracts in good faith, relying upon the apparent statutorial authority.

2. Thereafter, Appellants sought preliminary injunction to restrain payment under the scheme. However, Appellants abandoned their request for injunction to prevent the initial payment. The schools continued performing the services authorized by statute. Not until a motion for summary judgment was filed did Appellants first indicate their intent to seek to enjoin.

3. The schools could not, prior to *Lemon I*, have predicted the act's unconstitutionality with assurance sufficient to undermine Appellees' reliance on the statute. *Lemon I* was not "foreshadowed."

4. The schools had a "reliance interest" to be considered in fashioning an *equity* decree calling for a "sensible recognition of the practical realities of the situation."

5. Appellants urged a strange amalgam of flexibility and absolutism, claiming on the one hand they did not seek to have the

schools disgorge prior payments, yet seeking to enjoin future payments, and urged injunction under the rule of *Norton.*

6. Great hardship would be imposed upon the public, state officers, school budgets and implemented school programs if the rule of *Norton* were to be immutably applied as of the date of the *Lemon I* decision.

In fashioning the equity decree in the light of the rule of *Norton* and of the "reliance interest" thus demonstrated, the United States Supreme Court observed, statutory or even judge-made rules of law are hard facts on which people must rely in making decisions and in shaping their conduct; until judges say otherwise, *state officers* have the power to carry forward the directives of the state legislature; those officials may, in some circumstances, elect to defer acting until authoritative judicial pronouncement has been secured; but where there are no fixed and clear constitutional precedents, the choice is essentially one of discretion, and state officials may rely upon the basic presumption of constitutional validity of a duly enacted statute.

The Supreme Court concluded by saying that federalism requires that federal injunction, unrelated to state courts, be shaped with concern and care for the responsibilities of the executive and legislative branches of state government. "In short, the propriety of the relief afforded Appellants by the District Court, applying familiar equitable principles, must be measured against the totality of circumstances and in light of the general principle that, absent contrary direction, state officials and those with whom they deal are entitled to rely on a presumptively valid state statute, enacted in good faith and by no means plainly unlawful."

The circumstances in the case at bar are not analogous to and, in fact, are significantly different than those in *Lemon II.*

■ a. *Lemon II* involved the fashioning of a decree in *equity.* The case at bar is a statutory proceeding (denial of protest seeking recovery of taxes paid).

While our code pleading purports to abolish the distinction between actions at law and actions in equity, "A party bringing an action is required to frame his pleading in accord with some definite, certain theory, and the relief to which he claims to be entitled must be in accord therewith; on appeal he is bound by the position and theory assumed, and on which the case was heard in the trial court." *Yellow Cab Company v. Allen,* Okl., 377 P.2d 220 (1962), quoting from *Lenz v. Young,* Okl., 307 P.2d 844 (1957). A chancellor has power to do equity and mold a decree to the necessities of a particular case. *U.S. v. Fogaley* (C.A.Okl.1951) 190 F.2d 163; *Sinclair Oil & Gas Co. v. Bishop,* Okl., 441 P.2d 436 (1967). But in law, a trial court is limited to the particular issues framed by the pleadings. *La Bellman v. Gleason & Sanders, Inc.,* Okl., 418 P.2d 949 (1966). In the fashioning of a judgment in law, courts are less impelled to apply principles of equity.

b. No compulsion on the part of public officials to perform statutory duties until otherwise directed by the courts is involved in the case at bar, in contrast to *Lemon II.*

■ c. General Motors Corporation had a free choice as to whether it would rely upon the opinions and representations of public officials as to the constitutionality of the non-tax "agreements." It was under no compulsion to act in reliance. It could have obtained a declaratory judgment prior to entering into the purported non-tax arrangement. Instead, it relied upon the representations in the face of the Constitution and laws of Oklahoma, and did so at its peril.

d. There is a strong suggestion of *public weal* involved in *Lemon II* and other cases in considering the force of a "reliance interest" as against the unconstitutionality of a contract or statute where prospective effect is given by court decree to a determination of unconstitutionality. In the case at bar, the reliance interest to be weighed involves General Motors Corporation's individual rights only. In *Lemon II,* mid-term school budgets, programs, and expendi-

tures made in reliance upon a statute would invoke an extreme *public* hardship if abruptly terminated by a decree of unconstitutionality.

Our determination herein that the circumstances present in the case at bar do not place it within the exception enunciated in *Lemon II* to the rule of *Norton* is consistent with the prior holdings of this Court.

In *Oklahoma Ed. Ass'n, Inc. v. Nigh*, Okl., 642 P.2d 230 (1982), a large number of individuals acted in reliance upon the constitutionality of a statute prior to this Court's determining it to be unconstitutional. The liability of public officials who acted in good faith reliance upon the constitutionality of the statute was likewise involved (p. 239). Both considerations impelled the Court to protect officials and citizens from liability which would result if this Court's opinion was given retrospective effect.

In *State ex rel. Poulos v. State Bd. of Equal.*, Okl., 646 P.2d 1269 (1982) (*Poulos III*), and 552 P.2d 1138 (1976) (*Poulos II*), an unconstitutionally inequal established system of tax valuation was determined to exist. The ability of the various county governments to function, the reliance interests of great numbers of taxpayers, and the potential liability of public officials were implicitly involved. The Court in fashioning its decree made its effective date prospective.

In *State v. Board of County Com'rs of Creek County*, 188 Okl. 184, 107 P.2d 542 (1940), a large number of delinquent taxpayers secured a reduction of their taxes under a statute thereafter adjudged unconstitutional, while other taxpayers did not. The County Commissioners and County Treasurer continued to act under the law after the action was filed against them questioning the act's constitutionality, and after they had been advised by the Attorney General to refrain from acting under it, and after they were advised by the Attorney General that the act had been adjudged, and was, unconstitutional. During the time the defendant officers were pro-

ceeding under the act, they reduced the assessments and taxes on some 4,264 separate pieces of property. In applying what was in effect equity reliance rules, this Court said (547):

> "One asserting rights under such a void law must bring himself within some established exception [to the rule of *Norton*]. The rule that no rights may be acquired under such a statute applies as well to rights acquired under acts performed or executed pursuant to such statute before the final determination of the unconstitutionality thereof, as to those sought to be acquired under acts performed thereunder."

In striking down the statute and in declining to ameliorate the effect of a pronouncement of unconstitutionality, this Court said (554):

> "It follows that the contention of the plaintiffs must be sustained. To hold otherwise and to sustain the judgment of the trial court would be to say that constitutional inhibitions may be lightly defeated and circumvented by subordinate executive officers, acting in excess of their lawful authority, provided the acts of such officers were fully consummated before the extent of their authority is determined in the proper forum—namely the courts. This we cannot do. Such a rule would encourage citizens to rush in and get relief under a doubtful law before its validity could be tested in the courts. It would encourage hasty action on the part of administrative officers, where deliberation and caution should be encouraged instead. It would discourage the prompt payment of taxes by holding out to the taxpayers the prospect of future legislation under which they might obtain special advantages. It would open an easy avenue for the evasion and defeat of constitutional safeguards, not only in tax matters, but in others."

In *Gordon v. Conner*, 183 Okl. 82, 80 P.2d 322, 118 A.L.R. 783 (1938), plaintiff resident taxpayers sought recovery against the sheriff and members of the board of county commissioners under a statute au-

thorizing the action to recover sums paid to the defendants pursuant to a statute thereafter determined to be unconstitutional. At issue was the weighing of the public interest in recovering sums paid out under a void statute against the duty of public officials to perform their statutory duties and their right to rely upon the statute's presumed constitutionality (p. 324):

"The sheriff, however, relying upon the provisions of the special act, appointed six deputies. In this action plaintiffs seek to recover for the county, a sum equal to the salaries paid to the two deputies from July 1, 1933, to the date of filing the suit (April 27, 1936), and a similar sum for their own use and benefit.

"The trial court held that the special act was unconstitutional, but further held that the case of *Wade v. Board of Commissioners of Harmon County,* 161 Okl. 245, 17 P.2d 690, was controlling of the issues involved herein. In that case, it was held: 'The members of the board of county commissioners of a county will not be penalized ... for the payment of salaries to county officers under an unconstitutional local act where such payments were made in good faith and before the law is declared unconstitutional, or before they are advised by the proper official as to its unconstitutionality.'

"No contention is made that defendants were ever advised by the proper officials as to the unconstitutionality of the special act. Plaintiffs take the position that since this court on several occasions has held similar acts to be unconstitutional, the defendants, being chargeable with a knowledge of the law, are chargeable with knowledge of the unconstitutionality of the special act involved herein. We cannot concur in this contention. The unconstitutionality of the special act involved herein had never been judicially established. Defendants were entitled to rely thereon as a source of authority for their official acts without assuming the risk of incurring heavy penalties in the event such act was subsequently declared to be in controvention

of a constitutional provision and therefore invalid. The presumption is that a law is constitutional until its unconstitutionality is judicially established." (Citation omitted.)

*State ex rel. Cartwright v. Dunbar,* Okl., 618 P.2d 900 (1980) comports with *Lemon II* and the foregoing cases. It is in line with the general rule in Oklahoma and elsewhere. See 16 Am.Jur.2d Constitutional Law, §§ 256, 257, 688.

BARNES, C.J., and HODGES, LAVENDER, DOOLIN, HARGRAVE, OPALA, and ALMA D. WILSON, JJ., concur.

ORDER FOR STAY OF MANDATE

THE APPLICATION FOR STAY OF MANDATE filed in this Court on the 15th day of August, 1983, by Plaintiff-Appellant, General Motors Corporation is hereby granted as follows:

THE ISSUANCE OF MANDATE IN THE ABOVE CAUSE is hereby stayed for a period of ninety (90) days from this date to allow Plaintiff-Appellant the opportunity to seek review of the judgment of this Court by the Supreme Court of the United States.

In the event that Plaintiff-Appellant proceeds to seek timely review of the judgment by the United States Supreme Court, the issuance of mandate shall continue to be stayed until such time as the United States Supreme Court makes a final determination thereof.