BIXLER v. FASSNACHT-BIXLER
2022 OK CIV APP 28
515 P.3d 856
Case Number: 118841
Decided: 05/06/2022
Mandate Issued: 07/20/2022
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II
Cite as: 2022 OK CIV APP 28, 515 P.3d 856

 

IN RE THE MARRIAGE OF:

GENE BIXLER, Petitioner/Appellant,
v.
KIMBERLY FASSNACHT-BIXLER, Respondent/Appellee.

APPEAL FROM THE DISTRICT COURT OF
PAYNE COUNTY, OKLAHOMA

HONORABLE STEPHEN R. KISTLER, TRIAL JUDGE

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

W. Franklin Muret, Jr. Stillwater, Oklahoma, for Plaintiff/Appellant

Allision J. Wilson, WILSON LAW GROUP PLLC, Stillwater, Oklahoma, for Defendant/Appellee

GREGORY C. BLACKWELL, JUDGE:

¶1 Gene Bixler appeals several parts of a divorce decree entered between him and his now ex-wife, Kimberly Fassnacht. On review, we find no error in the district court's decisions regarding support alimony, the distribution of funds from the sale of the family home, or the distribution of a Fidelity investment account, and therefore affirm the trial court as to those issues. We find, however, that the court erred in declaring Mr. Bixler's Unum

BACKGROUND

¶2 The parties were married in 1992. Mr. Bixler had been working at the Telex Corp. since 1981 and transferred to Johnson Controls when Telex went bankrupt in 1986. He remained employed until 2002, despite experiencing health problems and periods of being temporarily unable to work from 1982 onwards. In 1994 he was diagnosed with multiple sclerosis (MS). In 1996, Mr. Bixler was rated thirty percent disabled by the Veterans' Administration on the grounds that, while working as an Air Force computer technician for eight years between 1973 and 1981, he had been exposed to "some type of chemical." The VA found his MS was therefore service-related. Due to progression of the disease, his evaluation would rise to one hundred percent disabled by 2012. In 2002, after a particularly severe episode of disability, Mr. Bixler ceased employment.

¶3 Ms. Fassnacht worked until 1995 when the couple's first child was born. After that, she spent time caring for Mr. Bixler in his periods of disability and homeschooling the children, and took temporary and part-time jobs in 2001-2002 when Mr. Bixler's health problems made him entirely unable to work. Ms. Fassnacht testified that she had to end this employment when her daughter developed a neurological disorder. She also testified that an episode of breast cancer in 2006, which resulted in a bilateral mastectomy, limited her ability to work. From 2002 to 2017, the family appears to have received income from a combination of disability benefits, insurance proceeds, various savings, and inheritances.

¶4 In June 2017, Mr. Bixler filed for divorce. Ms. Fassnacht counter-filed. At the time of trial, Mr. Bixler was sixty-two, and Ms. Fassnacht was fifty-five. Mr. Bixler's monthly income consisted of $2,030 in Social Security disability (untaxed); $3,228 in Veterans' Administration Disability Benefits (untaxed, and to be reduced to $3,057 upon divorce); $1,129 in income from a Unum disability insurance policy (after tax); and $141 from a government pension guarantee plan (his Telex Corp. pension plan having been liquidated as part of a bankruptcy), for a total of $6,357 per month after divorce. Ms. Fassnacht had no job and no immediate source of income.

¶5 The contentious issues at trial, which are here propositions of error, were as follows. First, Ms. Fassnacht argued that she had made substantial contributions to the purchase and remodeling of the family home from inherited funds and requested an equitable adjustment to the property distribution to account for those funds. The court allowed an equitable adjustment of approximately $100,000.

¶6 Second, Ms. Fassnacht argued that the Unum disability policy had been purchased with marital funds and its proceeds should be divisible. Mr. Bixler argued that it constituted indivisible disability payments. The trial court found the proceeds of the policy marital, and ordered Mr. Bixler to pay half the proceeds to Ms. Fassnacht each month as alimony in lieu of property division.

¶7 Third, Ms. Fassnacht argued that contributions to a Fidelity investment account were made with joint funds, and hence the account was divisible. Mr. Bixler argued that the account was started with his separate funds, no contributions were made after marriage, and no increase was due to any form of joint industry. The trial court again found the account was joint and ordered it divided between the parties.

¶8 Fourth, Ms. Fassnacht requested support alimony to allow her to retrain, complete a nursing degree, and adjust to self-sufficiency. Mr. Bixler argued that he was unable to pay alimony as a matter of law because, although his post-divorce income would be $6,357 per month, the newly enacted subsection (K) of 43 O.S. § 13443 O.S. § 134above his stated needs, if § 134(K) were applied, he had no available income for the purpose of paying support alimony. The trial court determined the statute could not be applied because it had not been enacted until after the commencement of the divorce.

¶9 Mr. Bixler appeals from the decree as to each of these issues.

STANDARD OF REVIEW

¶10 "A divorce suit is one of equitable cognizance in which the trial court has discretionary power to divide the marital estate." Colclasure v. Colclasure, 2012 OK 97295 P.3d 1123Id; 43 O.S.Supp.2012, § 121Colclasure, ¶ 16 (footnote omitted). "The trial court has wide latitude in determining what part of jointly-acquired property shall be awarded to each party." Id. This Court will not disturb the trial court's decision regarding property division unless the trial court abused its discretion or the decision is clearly against the weight of the evidence. Standefer v. Standefer, 2001 OK 3726 P.3d 104See also Smith v. Villareal, 2012 OK 114298 P.3d 533de novo, however. Lincoln Farm, L.L.C. v. Oppliger, 2013 OK 85315 P.3d 971

ANALYSIS

THE AWARD OF $100,000 IN ADDITIONAL EQUITY

¶11 Testimony at trial indicated that Ms. Fassnacht inherited approximately $600,000 during the marriage; that she used approximately $243,000 of these funds to make the down payment on the family residence; and that she used another $140,000 of this money to renovate the home, including adding a media room and swimming pool. These renovations were allegedly in part to accommodate Mr. Bixler's disabilities, thus preserving his future right to a one-time payment from the Office of Veteran's Affairs for the same purpose, which Mr. Bixler can now use to renovate another home after the divorce. Ms. Fassnacht requested an equitable adjustment to the property distribution on these grounds.

¶12 Mr. Bixler's first argument is that the court actually declared $100,000 of the home equity to be separate property. Mr. Bixler argues that Ms. Fassnacht's contributions in these areas were not traceable to separate funds, or were co-mingled, or were intended as gifts, and hence could not be classed as separate funds. Separate property is not subject to division, and 43 O.S. § 121

¶13 Mr. Bixler's next argument is that, even if this was not a traditional segregation of separate property, the same factors, plus Mr. Bixler's own situation and contributions, are relevant in considering whether the court should have made a different equitable distribution. A trial court has wide discretion in the division of marital property and the decision dividing such property will not be disturbed on appeal unless contrary to law, against the clear weight of the evidence, or an abuse of discretion. Jackson v. Jackson, 2002 OK 2545 P.3d 418

THE UNUM DISABILITY BENEFITS

¶14 Mr. Bixler argues that his Unum disability benefits were not jointly acquired property subject to division. He argues that Christmas v. Christmas, 1990 OK 16787 P.2d 1267

¶15 In Christmas, a wife filed a petition for divorce in December 1987. Two weeks later, her husband, a firefighter, sought disability benefits based on an inability to work because of job stress. In July 1988, he was awarded disability benefits. Id. ¶ 3. The trial court found that these benefits constituted a divisible pension benefit. The Supreme Court reversed the trial court's decision, applying a "replacement analysis" to the facts. A replacement analysis "focuses on the replacement nature of the benefits and classifies benefits according to the nature of the assets they replace." Id. ¶¶ 6-8. The Christmas decision distinguished the divisibility of "wage continuation plans" from that of "retirement pensions," noting:

All wage continuation plans are deferred compensation and function as insurance. Retirement pensions insure against superannuation, survival beyond retirement age. They function as a substitute for life savings. If a worker was not provided retirement coverage, the additional wages received would presumably be saved for superannuation. These savings, earned during the marriage, would unquestionably constitute joint property.

Id. ¶ 7.

¶16 Beyond citing the rule of Christmas, Mr. Bixler does little in his briefing to explain why the involved benefits should be classed as a "wage continuation," i.e., a substitute for non-divisible wages earned after divorce. As Christmas notes, "the nature of husband's benefits determines the classification, not the fact [that] the benefits are termed a 'disability pension' in Title 11." Christmas, ¶ 10. The record is clear, however, that Mr. Bixler began drawing on the Unum disability benefits before normal retirement age, and the benefits ceased when he turned sixty-five, which occurred last year. This fact heavily favors a decision that the benefits were a "wage continuation" rather than a retirement benefit. Further, Mr. Bixler's testimony was that the policy was purchased from a former employer not as a retirement plan, but as disability insurance and was "similar to or in the nature of an insurance-type policy," which was purchased "to make sure [his] family was supported if something happened because of [his] health." Ms. Fassnacht did not rebut this testimony and essentially agreed that the policy was intended to replace Mr. Bixler's income in the event he could not work. The policy was important "[s]o we would be able to maintain income ... had he become disabled."

¶17 Nevertheless, Ms. Fassnacht argues the Unum plan should not fall into the wage-substitution bucket outlined in Christmas because Mr. Bixler's lost wages were already more than replaced by disability payments from other sources, namely, Social Security and VA disability benefits. Ms. Fassnacht proposes that the Unum payments cannot constitute a wage substitution or continuation because all of Mr. Bixler's wages (and then some) have already been substituted by other disability benefits. The above-wage income provided by the Unum payments was therefore a substitute for savings against superannuation, rather than lost wages.

¶18 The rule of Christmas functions reasonably well in the simpler situation present in that case, where an employee benefit provided direct replacement of wages that would have been earned absent disability at a ratio of one-to-one or less. How this rule functions when the benefit results from a private insurance contract paid for with marital funds, and the benefit does not simply substitute for lost wages, but supplements income beyond those lost wages, is less clear. Even the Christmas declaration that "[a]ll wage continuation plans are deferred compensation and function as insurance," Christmas ¶ 7, is problematic because insurance principles would not normally contemplate a recovery greater than the loss sustained, i.e., a combination of disability benefits greater than the wages they replace. Nor does it account for the fact that "retirement" benefits may sometimes be drawn early and potentially act as a wage substitute.

¶19 Nonetheless, Christmas is the last word of the Oklahoma Supreme Court on this subject, and we find no indication that the Supreme Court either considered such a benefit to be joint property because it was purchased with joint funds, or intended any rule that such a benefit may not exceed the recipient's wages prior to disability. As such, we find that Christmas controls here, and the disability benefit was non-divisible. The trial court's award of one-half of the proceeds of that fund, is therefore reversed.

THE FIDELITY SAVINGS/INVESTMENT ACCOUNT

¶20 Mr. Bixler argues that this account was entirely funded before the marriage, and hence, should have been considered his separate property. His brief states that he testified to that effect but does not give a reference to the record. We will assume, however, that he did so.

¶21 Ms. Fassnacht testified that she remembered making contributions to the account after marriage, citing an increase in the number of shares owned in 1992. She also testified that a loan of $3,893 had been taken during the marriage against the original balance of approximately $9,700 and repaid with marital funds. Ms. Fassnacht further argued that it was not possible for the account to grow from approximately $6,000 to its value at separation (over $40,000) without additional contributions.

¶22 The burden of proof in a divorce proceeding is on the party seeking to have property declared separate. Standefer v. Standefer, 2001 OK 3726 P.3d 104

ALIMONY AND 43 O.S. § 134(K)

¶23 The trial court held that the provisions of 43 O.S. § 134

¶24 Before examining whether § 134(K) may be retroactively applied, we consider first how the statute came to be. In McCarty v. McCarty, 453 U.S. 210 (1981), the U.S. Supreme Court held that military retirement pay, unlike almost all other forms of retirement benefits accrued during marriage, could not be divided as a marital asset because, according to a later decision, "Congress intended that military retirement pay reach the veteran and no one else." Mansell v. Mansell, 490 U.S. 581, 584 (1989). Congress disagreed with this construction of its intent and in "direct response" to McCarty, Congress enacted the Uniformed Services Former Spouses' Protection Act (USFSPA). Id. at 581. The USFSPA "authorizes state courts to treat 'disposable retired or retainer pay' as community property. [10 U.S.C.] § 1408(c)(1)." Id. 

¶25 Concurrently, many retired military members took advantage of a separate law allowing a veteran with a service-connected disability to elect to waive retirement pay and receive VA disability payments in the same amount. These provisions effectively allowed veterans to "convert" taxable retirement pay into tax-exempt disability pay. See 26 U.S.C. § 104(a)(4) (2018); 38 U.S.C. § 5301(a)(1) (2003).

¶26 In Mansell, a veteran argued that after retirement pay was converted into an equivalent amount of disability pay it was no longer "disposable retired or retainer pay" subject to the USFSPA and had again become indivisible. Consistent with its view in McCarty, the Supreme Court approved of this interpretation, holding in Mansell that the USFSPA did not specifically state that retirement benefits waived in favor of disability pay were divisible, and hence military retirement pay made divisible by the USFSPA could be rendered indivisible again by converting it to disability pay. Mansell, 490 U.S. at 589. Subsequently, in Howell v. Howell, __ U.S. __, 137 S. Ct. 1400 (2017), the Supreme Court noted that, even though this pay was not divisible,

a family court, when it first determines the value of a family's assets, remains free to take account of the contingency that some military retirement pay might be waived, or, as the petitioner himself recognizes, take account of reductions in value when it calculates or recalculates the need for spousal support.

Howell, 137 S. Ct. at 1406.

¶27 It is against this backdrop that the Oklahoma Legislature enacted § 134(K), which became effective during the pendency of the divorce here. It states:

Notwithstanding any other provision of this section, a court shall not consider disability compensation received by a party from the United States Department of Veterans Affairs for service-related injuries for any purpose. Additionally, the court shall not offset any service-related disability income with other assets of the military member.

43 O.S.Supp.2017, § 134

¶28 Mr. Bixler's argument is that his own needs approximate $3,000-$3,500 per month, and § 134(K) reduces his post-divorce, after-tax income of $6,357 per month by $3,057, giving him a "statutory" income of only $3,300 per month, and leaving him "underwater" for purposes of calculating support alimony. Hence, Mr. Bixler argues, it was an abuse of discretion to award Ms. Fassnacht any alimony because he, after applying § 134(K), had no ability to pay it.

¶29 Ms. Fassnacht argued in the trial court, and argues again on appeal that: (1) § 134(K) cannot be retroactively applied in cases filed before its effective date; and (2) § 134(K) is an unconstitutional special law mandating, without a rational basis, unequal and inferior treatment of divorcing service spouses compared to all other divorcing spouses. The district court found that applying § 134(K) in the alimony inquiry would constitute an improper retroactive application of the statute, and did not address the constitutional question.

"Retroactive" Application

¶30 Ordinarily, statutes and amendments are to be construed to operate only prospectively, unless the Legislature clearly expresses a contrary intent. If doubt exists, it is resolved against retroactive effect. State ex rel. Harris v. Three Hundred & Twenty Five Thousand & Eighty Dollars, 2021 OK 16485 P.3d 242explicit retroactive intent was stated here.

¶31 Absent a statement of legislative intent, the Oklahoma Supreme Court has generally inquired into whether the statute is remedial/procedural or substantive in such cases. See Forest Oil Corp. v. Corp. Comm'n of Oklahoma, 1990 OK 58807 P.2d 77443 O.S. § 134

¶32 The "mode of procedure" rule is expressed in a number of cases. Its earliest Oklahoma expression appears to be that found in Shelby-Downard Asphalt Co. v. Enyart: "Where a new statute deals with procedure only prima facie it applies to all actions--those which have accrued or are pending as well as future actions." 1918 OK 50170 P. 708 Clark v. K. C., St. L. & C. R. Co., 219 Mo. 524, 118 S. W. 41. By comparison:

Statutes and amendments imposing, removing or changing a monetary limitation on recovery for personal injuries or death are generally held to be prospective only.... Statutory increases in damage limitations are changes in substantive rights and not mere remedial changes. Therefore, these increases are not applicable retroactively to injuries sustained prior to the effective date of the statute permitting increased recovery.

Thomas v. Cumberland Operating Co., 1977 OK 164569 P.2d 974

¶33 Remedial or procedural statutes which do not create, enlarge, diminish, or destroy vested or contractual rights, and which relate only to modes of procedure are generally held to operate retroactively and to apply to pending actions or proceedings, unless such operation would affect substantive rights. Id. 

Newman v. Newman and the "right" to alimony

¶34 Mr. Bixler first argues that there is no legal "right" to alimony and hence any "substantive or vested rights" inquiry ends there. He cites Newman v. Newman, 1930 OK 340290 P. 179Newman is mischaracterized here and has no applicability. It merely held that a spouse was not automatically entitled to an award of alimony.

Nantz v. Nantz, 1988 OK 9, 749 P.2d 1137

¶35 Mr. Bixler next argues that Nantz v. Nantz, 1988 OK 9749 P.2d 1137Nantz, 12 O.S.Supp.1983, § 1289, allowed the filing of a motion to modify or terminate support on the grounds of cohabitation. The legislature had explicitly stated in § 1289(G) that "the provisions of ... this section shall have retrospective and prospective application with regards to modifications of the provisions of a final judgment or order for alimony as support." Id. ¶ 8.

¶36 The question in Nantz was whether this statutory change retroactively destroyed a vested support alimony award in violation of the Oklahoma Constitution. Five justices of the Nantz court reasoned that, because the "death of either party will terminate alimony support payments absent agreement to the contrary" that an award of support alimony did not become a vested right until a payment was past due because the right could subsequently be "modified" by death before all payments were complete. Nantz, ¶ 10. Hence, the majority reasoned that the right to alimony must accrue or vest only when each monthly payment is due, and the legislature had not therefore retroactively modified any vested right.

¶37 The Supreme Court revisited Nantz in Messenger v. Messenger, 1992 OK 27827 P.2d 865Evans v. Evans, 1993 OK 59852 P.2d 145Nantz theory that an alimony award is not a final judgment and only vests on a month-to-month basis. In Messenger, the appellant attempted to increase an alimony award on the basis that post-decree law had authorized consideration of military retirement pay in alimony calculations. The appellant argued, per Nantz, that as the alimony award only vested at the time of each payment due, future payments could be recalculated and must be increased pursuant to this change in the law.

¶38 The Messenger Court, in an apparant withdrawal from the theory stated in Nantz, held that an alimony award was a final judicial decree, and a "judicial decree that creates a monetary obligation in an interspousal suit is a judgment which, when final, stands on a constitutional footing absolutely equal to any money judgment at law." Id. ¶ 14. Hence, a "judgment's effect and validity must be governed by the law in force at the time of its rendition" and later-enacted legislation could not authorize post-decree claims for additional spousal alimony support. Id. ¶ 15.

¶39 The Supreme Court later explicitly reiterated the rule of Messenger in Evans v. Evans, 1993 OK 59852 P.2d 145

Decreed support alimony obligations embody vested rights that are constitutionally protected from the effect of after-enacted legislation by the provisions of Art. 5, § 54, and Art. 2, § 7, Okl. Const. Messenger teaches that the constitutionally shielded concept of an "accrued" or "vested right" in an adjudicated support obligation stands unabrogated by Nantz v. Nantz.

Id. ¶ 11.

¶40 The Nantz theory that an alimony award only vests month-to-month has clearly been repudiated by subsequent decisions, and has no applicability in the inquiry here. Nor does Evans settle the question, because it forbids modification only of a "decreed support alimony obligation" by later legislative enactments. Neither case, which Mr. Bixler relied on extensively, comments directly on the situation we have here: a statutory change that takes place during the pendency of a divorce. Thus, we must resort to more general methods to determine whether the statute should apply.

Substantive versus Procedural Changes

¶41 Even though the "procedural rights versus vested rights" principle is clearly established, where a change in the method of calculating an alimony award fits in this scheme is not immediately obvious. If the legislature had specifically capped or eliminated alimony, the statute would be substantive pursuant to Thomas. See supra, pg. 14. The difficulty here is how to interpret a statutory change which, in this case, and likely in most similar cases, reduces or eliminates alimony, but does not explicitly cap or eliminate it?

¶42 While it is possible to characterize § 134(K) as a mere procedural change in the way one factor of the alimony inquiry is assessed, its effect appears to go well beyond that of procedure. When § 134(K) became effective in November 2017, it undisputedly "diminished," and in fact reduced to zero, the amount of support alimony available compared to that available to Ms. Fassnacht at the time of filing. It eliminated the possibility of her receiving an award of alimony entirely in this case.

¶43 We find little logic in the argument that a substantive limit on a remedy cannot act after a case is filed, but a procedural limit with the same practical effect can. Finding a statute such as § 134(K) to be procedural implies that any substantive right can be effectively destroyed retroactively as long as the legislature does so by a "procedural" formula that does not explicitly destroy the right in its entirety in every case.de facto cap or reduction in alimony aimed at spouses married to a service member collecting disability. We further see little difference between an award of alimony as an incident to dissolution, and an award of property, money, or pension benefits as an incident to dissolution. The latter are clearly substantive rights that would accrue, at the latest, at the time of filing. As such, the statute here is substantive.

Vesting

¶44 The next question is whether this substantive right to an award of alimony incident to dissolution vested before the law was changed, that is, vested at the time of the final alimony judgment, or at the time of filing. Mr. Bixler argues that this substantive right vested only at the time of the final alimony judgment. This is difficult to harmonize with the treatment of such rights indicated by case law. The case of Barry v. Bd. of Comm'rs of Tulsa Cty., 1935 OK 70149 P.2d 548

¶45 In 1933, the Barry plaintiffs filed an application with the board of county commissioners seeking a correction of erroneous assessments of real property for the years 1931 and 1932. The application was pursuant to statute. Id. ¶ 2. The board denied the application on the grounds that the 1933 legislature had repealed the relevant statute, and hence it was no longer required to correct erroneous assessments. The Barry Court rejected the Board's argument that destroying the remedy of the reduction of an erroneous assessment was merely a procedural change, or the "repeal of a statutory privilege which could be withdrawn at any time by the Legislature." Barry noted that an "accrued right" occurs at the time when there exists both suitable facts and "legal authority to demand redress." Id. ¶ 0 (syllabus of the Court). Citing Barry, the Court of Civil Appeals held in Bellah v. Bellah, 1999 OK CIV APP 66986 P.2d 528

¶46 At the time of filing here, the remedy sought was alimony, based on the statutes in effect at that time. Alimony was available to Ms. Fassnacht under those statutes but it is not available under the new law. Ms. Fassnacht, who filed a counter-petition for divorce here, presumptively did so with the knowledge of the remedies at the time of filing. If the circumstances were reversed, and 43 O.S. § 134not having to pay alimony in his decision to file for divorce. We need not ignore the practicalities of these reliance interests when considering the time at which a right legally vests. Oklahoma Ed. Ass'n, Inc. v. Nigh, 1982 OK 22642 P.2d 230Gen. Motors Corp. v. Oklahoma Cty. Bd. of Equalization, 1983 OK 59678 P.2d 233

¶47 The traditional view is that a substantive right vests at the time of injury. See Thomas v. Cumberland Operating Co., 1977 OK 164569 P.2d 97443 O.S. § 134

CONCLUSION

¶48 The § 134(K) question here is a complex one because the situation does not fit neatly within the existing rules regarding retroactive application of statutory changes. But the trial court reached the correct result, and we therefore affirm the award of alimony as calculated, subject to the proviso below. Additionally, the court's decisions regarding the "equitable offset" for payments made to improve the home, and the Fidelity account, are also affirmed. We find, however, that pursuant to the current rule of Christmas v Christmas, the Unum disability policy is not divisible. As such, we reverse the trial court on this issue. On remand, the court may enter any order it finds just, consistent with this opinion, regarding the method of repayment of the proceeds of the Unum policy. As noted in footnote 2, above, this may include, upon proper motion, an adjustment to the support alimony award.

¶49 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

WISEMAN, P.J., and RAPP, J., concur.

FOOTNOTES

both disability pay and full retirement pay.

entitlement to a recovery with the right to seek a recovery. No party is entitled to a recovery until the statutory/common law conditions for the recovery are tested, and judgment is rendered in that party's favor. The right to seek the recovery, however usually accrues "when a litigant first could have maintained his action to a successful conclusion." MBA Commercial Constr., Inc. v. Roy J. Hannaford Co., 1991 OK 87818 P.2d 469

43 O.S. § 134Smith v. Westinghouse Elec. Corp., 1987 OK 3732 P.2d 46612 O.S. § 2024See Pub. Serv. Co. of Oklahoma v. Duncan Pub. Utilities Auth., 2011 OK CIV APP 15248 P.3d 400

12 O.S. § 696.4